IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2017

IN RE LENA G.

**Appeal from the Juvenile Court for Washington County**
**No. J10171   Robert G. Lincoln, Judge**

_____

**No. E2016-00798-COA-R3-PT**

_____

This is a termination of parental rights case involving the child, Lena G. ("the Child"), who was fifteen years of age at the conclusion of trial.  On October 8, 2013, the Washington County Juvenile Court ("trial court") granted temporary legal custody of the Child to the Tennessee Department of Children's Services ("DCS").  The Child was immediately placed in foster care, where she has remained since that date.  Following a hearing, the trial court entered an order on June 11, 2014, adjudicating the Child dependent and neglected in the care of the parents.  On November 19, 2014, DCS filed a petition to terminate the parental rights of the Child's mother, Sherry G. ("Mother"), and her father, Teddy G. ("Father").  The trial court admitted Mother's hospital records as an exhibit during trial over her objection.  Following a bench trial, the trial court terminated Mother's and Father's parental rights to the Child after determining by clear and convincing evidence that (1) the parents failed to provide a suitable home for the Child, (2) the parents failed to substantially comply with the requirements of the permanency plans, (3) the conditions that led to the removal of the Child from the parents' custody still persisted, and (4) Mother was mentally incompetent to adequately care for the Child.  The trial court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the Child.  Both Mother and Father have appealed.  Having determined that the Child had not been removed from the parents' home for six months by court order when the petition to terminate parental rights was filed, we reverse the trial court's ruling regarding the statutory ground of persistence of conditions as to both parents.  We conclude that the trial court erred in admitting Mother's hospital records but determine this error to be harmless.  We affirm the trial court's judgment in all other respects, including the termination of Mother's and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Joseph O. McAfee, Greeneville, Tennessee, for the appellant, Teddy G.

Robert Black, Kingsport, Tennessee, for the appellant, Sherry G.

Herbert H. Slatery, III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Rachel Ratliff, Johnson City, Tennessee, Guardian Ad Litem.

Michelle Caggiano, Johnson City, Tennessee, Attorney Ad Litem.

**OPINION**

I. Factual and Procedural Background

The Child was previously removed from the parents' custody in January 2011 after DCS filed a petition alleging that the Child was dependent and neglected. In the prior DCS case, Mother underwent a psychological assessment in May 2011 with Dr. Willard Sims; the results of which were admitted as an exhibit at trial. That assessment, *inter alia*, provided:

> [Mother] has a closed case at Watauga Behavioral Health Services. Her last diagnoses include Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Personality Disorder Not Otherwise Specified, and [Intellectual Disability].[1] She was seen by Richard Kirk, LCSW of the Mobile Crisis Response Team on 05/30/96 and was referred for outpatient treatment. She was seen by Kathy Henley, M.Ed. of the Mobile Crisis Response Team on 04/26/03 due to an assault by her husband. She was diagnosed with Mood Disorder Not Otherwise Specified and Partner-Relational Problem. She was referred for outpatient therapy. She was seen by James Sapp, M.Ed. of the Mobile Crisis Response Team on 11/24/03 due to an anxiety attack and having made scratches to the back of her left wrist. She was diagnosed with Anxiety Disorder Not Otherwise Specified and Depressive Disorder Not Otherwise Specified. A safety plan was able

---

[1] We note that our Supreme Court has urged the use of "intellectual disability" whenever possible to avoid negative stereotypes and potentially hurtful terminology. *See Keen v. State*, 398 S.W.3d 594, 600 n.6 (Tenn. 2012) (citing the Tennessee General Assembly's 2010 amendment to Tennessee Code Annotated § 39-13-203); *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *3 n.1 (Tenn. Ct. App. Sept. 27, 2013).

to be developed and she was referred for outpatient treatment.  She denied any history of inpatient mental health treatment or any family history of mental illness.

* * *

## CLINICAL SUMMARY AND RECOMMENDATIONS:

[Mother] is a 46-year-old Caucasian separated female from Johnson City, Tennessee who was referred for a psychological evaluation by Melissa Brown of the Department of Children's Services.  She displayed an anxious mood and affect with sufficient levels of concentration and attention.  She appeared to be a credible historian and results of this assessment appear to be valid.  On the WAIS-IV, [Mother] obtained a Full Scale IQ of 55 which falls within the Extremely Low Range of intellectual functioning.  She has a diagnostic history of Mild [Intellectual Disability] and has experienced difficulties with communication skills and functional academic skills. Attempts to administer the Personality Assessment Inventory to [Mother] were unsuccessful. [Mother] reported symptoms of anxiety.  She is currently in a custody dispute related to her daughter.

Based on the information obtained in this evaluation, the following recommendations are being made:

> 1.   [Mother] would benefit from individual therapy to focus on symptoms of anxiety.  If these symptoms persist or intensify, she would benefit from a psychiatric consultation.

> 2.  In case of consideration of family reunification, [Mother] would benefit from intensive family therapy to focus on co-parenting issues, family rules and consequences, family communication processes, and on age-appropriate parenting techniques.

> 3.  In case of consideration of family reunification, [Mother] would benefit from successful completion of a DCS-approved parenting course to focus on age-appropriate parenting skills.

> 4.  In case of consideration of family reunification, [Mother] would benefit from some type of in-home service to monitor her behavior and her home environment, to insure compliance with recommendations, and to reinforce therapeutic interventions.

(Emphasis in original.) The trial court ultimately returned custody of the Child to Father upon finding that DCS failed to present clear and convincing evidence that the Child was dependent and neglected in Father's care. The trial court also ordered that Mother was to have supervised visitation with the Child and that the paternal grandfather would have no contact with the Child.

The trial court again removed the Child from Father's custody in April 2012 but did not find clear and convincing evidence that the Child was dependent and neglected in its subsequent order. The court subsequently returned the Child to the legal and physical custody of Father. The court ordered that Father could supervise Mother's visitation with the Child and that alcoholic beverages should not be on the premises where the Child resided.

On October 8, 2013, the trial court entered an emergency order removing the Child from the parents' home where both Mother and Father were living with the Child. In the removal order, the trial court found that "it was reasonable to make no effort to maintain the child in the home due to the circumstances of the family and the child." Following an adjudicatory hearing conducted on May 29, 2014, the trial court entered an order finding the Child to be dependent and neglected on June 11, 2014. The trial court found by clear and convincing evidence that the Child was dependent and neglected due to concerns resulting from Mother's ongoing mental health issues; Father's substance abuse issues; the parents' failure to acknowledge and protect the Child from the grandfather, whom the Child alleged sexually abused her; and the parents' failure to meet the Child's needs. Although it is undisputed that both parents were residing in the home, the Child was in the legal custody of Father at the time of removal.

DCS filed a petition to terminate the parents' parental rights to the Child on November 19, 2014. The trial court conducted a bench trial spanning the course of four days on October 12, 2015; November 6, 2015; January 25, 2016; and March 4, 2016. Jacki McCartt, the DCS Family Services Worker, testified regarding the efforts DCS made to assist Mother and Father in providing a suitable home for the Child from October 8, 2013, through February 8, 2014. According to Ms. McCartt, DCS held an initial Child and Family Team Meeting ("CFTM") to determine whether there would be an appropriate family placement for the Child, but no suitable family placement could be located. Ms. McCartt explained that DCS representatives discussed with the parents at that CFTM several concerns, including physical abuse, domestic violence, substance abuse, and the family's history with DCS. Subsequently, DCS placed the Child into a level-three foster home, where she received weekly counseling therapy sessions and case management with Omni Visions no less than three times per week. According to Ms. McCartt, a permanency plan was developed in November 2013; however, this plan was never ratified by the trial court.[2]

_____
[2] The November 2013 permanency plan is not contained within the record before us; therefore, it will not

Mother and Father resided together throughout the pendency of this case. According to Ms. McCartt, during the four months following the Child's removal from the parents' home, although DCS attempted to place services in the home to assist the parents with completing their required assessments, Father refused such in-home services. While services were also offered to Mother during that period separate from those offered to Father, Mother did not utilize the services. Father, however, did cooperate with the Child's therapy during that time period. Ms. McCartt related that the issues leading to removal were still ongoing during the four months following the Child's removal from the home and that she was unable to recommend unsupervised visitation for the parents during that time. On several occasions during the pendency of the case, Father indicated to Ms. McCartt that Mother was hospitalized at Woodridge Psychiatric Hospital ("Woodridge"). According to Ms. McCartt, Mother continued to experience ongoing mental health problems and had been hospitalized in Woodridge in April and August prior to trial.

DCS developed a permanency plan for the family on June 12, 2014, with dual goals of "Return to Parent" and "Adoption" and a target date for those goals of December 31, 2014. The permanency plan required the parents to complete a parenting assessment and follow all recommendations from such assessment; cooperate with in-home services and all recommendations they may provide; ensure the Child had no contact with the paternal grandfather; participate "actively, openly, and honestly" in family therapy and the Child's therapy upon the request of the therapist; develop communication skills during family therapy; and engage in visitations with the Child. Additionally, Father was to complete an alcohol and drug assessment, follow all recommendations from such assessment, complete a psychological assessment, and follow all recommendations from that assessment. The trial court ratified this permanency plan on June 30, 2014, entering an order reflecting the ratification on July 11, 2014. In its order, the court found that "the tasks in the Permanency Plan are reasonable and related to achieving permanency for this child and towards remedying the reasons that the child requires foster care." As part of the June 2014 permanency plan, Mother was also to complete a psychological assessment and follow the recommendations therefrom; however, Mother objected to this requirement in court. The trial court ordered that the requirement for Mother to participate in a psychological assessment and follow all recommendations be stricken from the plan, but Mother was ordered to continue in case management with Frontier Health.

be considered by this Court when addressing the ground of substantial noncompliance with the permanency plans. *See In re T.N.L.W.,* No. E2006-01623-COA-R3-PT, 2007 WL 906751, at *4 (Tenn. Ct. App. Mar. 26, 2007) ("We have previously held that when DCS is relying on substantial noncompliance with the permanency plan as a ground for termination of parental rights, it is essential that the plan be admitted into evidence.").

Following ratification of the June 2014 permanency plan, Mother underwent a parenting assessment, while Father underwent a parenting assessment, alcohol and drug assessment, and psychological assessment. Father's alcohol and drug assessment conducted by Robert C. Perry, MMHC, with Families Free provided, *inter alia*:

> [Father] presents with a very defiant attitude and is easily offended. He appears to be very uncomfortable around strangers and has a difficult time expressing and/or defining his emotions. According to [Father], his drinking at one time was significant and it is this tester[']s belief that episodes of binge drinking today is very likely significant though he did not score as alcohol dependent at this time. It is this tester's opinion that it will be very difficult for [Father] to accept any type of traditional A&D counseling and since his cognitive function is unknown to this tester, I can only presume that his ability to comprehend A&D psycho-education materials would be limited. Peer counseling and AA is likely to be the best fit for [Father].

Father's psychological assessment recommendations included:

> Based on the information obtained in this evaluation, the following recommendations are being made:
>
> 1. [Father] would benefit from individual therapy and alcohol and drug treatment. He would benefit from therapy which addresses any symptoms of anxiety. If these symptoms persist or intensify, he would benefit from a psychiatric consultation. He would benefit from therapy which addresses his pattern of substance use and relapse prevention. He would benefit from the administration of random urine drug screens.
>
> 2. [Father] would benefit from family therapy together with all princip[als] involved to focus on co-parenting issues as well as on the impact of alcohol and drug use in the home.
>
> 3. [Father] would benefit from successful completion of a DCS approved parent education course to focus on age-appropriate parenting techniques.
>
> 4. In case of consideration of family reunification, [Father] would benefit from some type of in-home service to monitor his behavior in his home environment, to insure compliance with recommendations, and to reinforce therapeutic interventions.

The report of the parenting assessment for both Mother and Father stated in relevant part as follows:

- Both [Father] and [Mother] appear to be challenged to meet the parenting demands of their daughter. It should be noted that testing revealed cognitive limitations and challenges in their ability to process both auditory and visual information. This reality will need to be considered as those who work with [Father] and [Mother] plan and help them to parent their child. INFORMATION AND GUIDANCE will need to be presented in brief, incremental components with modeled examples of appropriate parenting, along with opportunities for each parent to demonstrate understanding and competence.

- INTENSIVE PARENTING EDUCATION which includes appropriate developmental expectations, the importance of providing a nurturing and supportive environment for [their] child, and being emotionally available for [the Child], is recommended. Alternatives to corporal punishment as disciplinary practice may be included, with strategies specific to the needs and motivation of a teen.

- FAMILY COUNSELING, to help guide these parents to establish a parental role with their daughter and to support both parents and child to create a respectful and supportive relationship within the family dynamic, is advised.

As to Father, his parenting assessment also stated:

[Father] has established himself as hostile toward interventions. Such perspective in concert with cognitive limitations suggests a high likelihood that he may lack the ability to gain motivation and investment in the well-being of his child.

Additionally, Mother's parenting assessment explained:

If [the Child] is experiencing school issues similar to those her mother could not resolve herself, the likelihood, after thirteen DCS referrals, of [Mother] being able to parent and provide support for [the Child] to be successful in school attendance, is questionable. [Families Free services] to address the issues that led to custody, as well as wrap around services and educational support that will support the child to be capable/willing to self-monitor to attend school, are recommended.

On January 6, 2015, DCS developed an updated permanency plan for the parents, which included essentially the same tasks for the parents to complete as the previous plan. The new plan, however, incorporated the recommendations from the parents' completed assessments and provided a target date of June 30, 2015. As recommended by the parenting assessments, the permanency plan required the parents to participate in intensive parenting education, cooperate with in-home services, and participate in family therapy "to establish a parental role with [the Child]" and launch a "respectful and supportive relationship within the family dynamic." Regarding the intensive parenting education, the parents were to "demonstrate participation and understanding of concepts," "cooperate with the service provider and program requirements until successfully completed," and demonstrate during visits their "ability to utilize parenting skills learned."

The updated permanency plan also required Mother and Father to allow DCS and the guardian *ad litem* to visit the home during the pendency of the case in order to monitor "safety issues" and the "appropriateness of the environment." Additionally, Father was to participate in individual therapy as recommended by his psychological assessment and to attend weekly Alcoholics Anonymous ("AA") meetings as recommended by his alcohol and drug assessment. The trial court ratified this permanency plan on January 12, 2015, and entered an order reflecting the ratification on January 27, 2015. In its order, the court found that "the tasks in the Permanency Plan are reasonable and related to achieving permanency for this child and towards remedying the reasons that the child requires foster care."

Amanda Shipley was the Child's case manager with Omni Visions from January 2014 to December 2014. Ms. Shipley testified that as case manager, she saw the Child weekly and facilitated visits between the Child and the parents. Most visits occurred in the family home. Ms. Shipley also attended the Child's therapy appointments. The parents agreed to attend the Child's therapy sessions twice a month; however, according to Ms. Shipley, "that only happened a few times." Following a court hearing in February 2014, Father informed Ms. Shipley that he would not attend therapy again. Thereafter, the parents stopped attending family therapy for approximately six or seven months. After that period, according to Ms. Shipley, they attended "just a few more" while she was assigned to the case. During one visit, Ms. Shipley overheard Father instructing the Child not to talk or cooperate with DCS. Ms. Shipley explained that there were numerous times when Mother could not attend visits because she was hospitalized. She also indicated that Mother hardly spoke or interacted with the Child during the visits Mother did attend.

Ms. Shipley testified regarding two occasions when she had to cancel the visits between the Child and the parents. In April 2014, a cancellation occurred upon Ms. Shipley's and the Child's arrival because Father appeared intoxicated. When Ms. Shipley

ended the visit, Father began cursing and was gesturing rudely to her and the Child as they drove away. Father subsequently left voice mail messages for Ms. Shipley wherein he admitted that he had been "drinking a little bit today." According to Ms. Shipley, the Child cried during the entire forty-five-minute drive back to Bristol following that visit. Additionally, Ms. Shipley had to cancel a visit in May 2014 due to Father's "aggressive" behavior. Father appeared to be angry with the Child, and when Father questioned the Child about a statement she had made in court the previous day, he yelled at her and said, "[f]ine then, you can just stay in foster care." Father also was using curse words and "flipped [them] off."

At the time of trial, Kerri Rogers was the Child's case manager with Omni Visions. She had replaced Ms. Shipley as the Child's case manager in December 2014. At trial, Ms. Rogers explained having knowledge of at least five or more instances when Mother was hospitalized at Woodridge. Ms. Rogers reported that there were visits with the Child at the parents' home when Mother slept in the recliner during the entire visit. Even when Mother was awake, she was not interactive with the Child. Ms. Rogers reportedly observed Mother on multiple occasions speaking to people in the home or under the porch who were not present.

Ms. Rogers further testified that Father became angry on one occasion, throwing a basketball in her direction. On another occasion, she observed Father instructing the Child not to take her court-ordered medication. During a more recent visit in September 2015, Father had appeared as though he were intoxicated. Ms. Rogers described Father as sweating, slurring his words, and talking loudly. Mother informed Ms. Rogers that Father had been drinking. Ms. Rogers indicated that she had never felt comfortable recommending to DCS that the parents have unsupervised visitation with the Child.

Dr. Helen Lane testified as an expert in the field of child development and parenting assessments. She performed Mother's and Father's respective parenting assessments. During Father's assessment, he described himself as "[h]ot tempered sometimes when people keeps on messing with me." Father also reported a history of driving under the influence charges, but stated that he had not confronted as many legal issues since the Child's birth. In her parenting assessment, Dr. Lane concluded that Father was "at high risk to engage in inappropriate parenting practices" and that there is a "high likelihood that he may lack the ability to gain motivation and investment in the wellbeing of his child." Dr. Lane explained that Father's results from testing placed him within the "moderately mentally challenged range." Furthermore, Father tended to minimize the circumstances and stressors surrounding his family's circumstances, listing family strengths that Dr. Lane, as assessor, did not observe.

As to Mother, Dr. Lane expressed concern that she appeared not to be invested in the Child. According to Dr. Lane, Mother did not display a warmth or nurturing behavior toward the Child and seemed disconnected during the visit. Mother's results from testing

- 9 -

during her parenting assessment placed her in the "moderately mentally challenged range of cognitive functioning." Mother informed Dr. Lane that she had admitted herself to Woodridge about two or three times that year. Dr. Lane also took note that Mother was very self-focused despite the Child's absence from the home, opining that Mother might be unable to adequately parent the Child due to her lack of concern for the Child.

Dr. Lane articulated additional concern regarding the lack of behavioral guidelines provided by the parents and her observation that the Child "seemed to be more in control than anyone in that home." According to Dr. Lane, if the Child were left in the environment of the parents' home, it was unlikely that Mother would be able to bring the Child into "independent and sustaining adulthood." Dr. Lane maintained that the parents' home would not provide a "good, healthy situation" for the Child, and if the parents did not complete the recommendations from the parenting assessments, the home would be unsafe for the Child.

Lisa Tipton, the executive director and custodian of records for Families Free, testified that the agency provided intensive parenting education to the parents. Certain Families Free records were admitted as an exhibit at trial. Those records reflect the visits to the family home and telephone conversations between the case manager and the parents. On January 14, 2015, the case manager visited Mother at Woodridge, when Mother reported that she was seeing and hearing "bad men" again. Families Free attempted to schedule a session on January 14, 2015, but Father did not answer. According to Ms. Tipton, a session scheduled for January 20, 2015 was cancelled by Father. On January 21, 2015, the Families Free case manager travelled to the parents' home for a scheduled session, but no one was home. Subsequently, Father called and cancelled the session scheduled for January 26, 2015.

Families Free records further established that during a case manager's visit with Mother at Woodridge on January 28, 2015, Mother reported that she had begun hearing and seeing people again and that Father had stopped providing medication to her because it was not helping. On the same day, when a Families Free case manager made a visit to the home, Father was present. Father became angry when the case manager arrived. According to Ms. Tipton, Father had been served with the petition to terminate parental rights earlier that day. Father made statements to the Families Free case manager declaring that he would blow up the DCS building, kill the DCS family services worker, blow up the entire courthouse, and kill the judge. According to Ms. Tipton, the records reflected that as of January 28, 2015, "due to [Father's] constant angry outbursts, [Families Free had] never been able to get into any of the parenting education curriculum." Thereafter, Families Free services ended and were not reauthorized to begin again until July 2015.

A Families Free case manager met with Father on June 21, 2015, for an initial appointment after services were reauthorized. While completing paperwork, Father

reported that Mother was in Woodridge. Father also indicated that he had a drinking problem and was attending AA meetings once a week. On July 27, 2015, Father contacted the case manager to cancel a scheduled parenting education session; the visit was rescheduled for July 31, 2015. Father, however, called and again cancelled the scheduled parenting education session indicating he "needed to pay his light bill" and would not be home. On August 24, 2015, the case manager visited the parents' home and attempted to develop a service plan with the parents. Father appeared "resistant to agreeing with any service plan goals" at that time. During that visit, the case manager noted that Mother's "verbal communication and acknowledgment of the situation was very limited." On August 31, 2015, the case manager again visited the parents' home, observing Mother's agitation demonstrated by her talking, yelling, and apparent responses to someone the case manager did not see. Mother subsequently began hitting the couch. Father indicated to the case manager that Mother "gets like this for a few days" before needing to be committed to Woodridge. Subsequently, the case manager met with Father at the family home regarding the first parenting education curriculum session. The case manager reported that Father was "friendly and open" during that session.

Father cancelled a subsequent parenting education session scheduled for October 8, 2015, explaining that "he was heading to the hospital to see [Mother]" and would not be home. Father did meet with the case manager on October 22, 2015. According to agency records, "Father indicated that [Mother] had gotten a prescription the previous week for a nebulizer, however, he had been unable to obtain the nebulizer for her, which resulted in her being hospitalized again." The case manager's notes further state:

> [Father] was engaged with [case manager], but remains hostile against DCS and "the state" and feels like he is being targeted. He has very little self-awareness of the impact his actions, including his alcoholism and [Mother's] deteriorating mental and physical health[,] have on [the Child]. His hostile attitude and resistance to change, in addition to his limited cognitive functioning, present difficulties in [Father's] learning and implementing new parenting techniques and approaches.

On October 27, 2015, Father again cancelled a parenting education session and indicated that Mother was hospitalized. The parenting education session was rescheduled for the next day, which Father later cancelled by voicemail. The case manager noted that Father's speech was "slurred on the voice mail." Father subsequently cancelled a session for October 29, 2015, by reason of his claimed "strep throat." The case manager again noted that Father's speech appeared to be slurred. Father informed her he had not been drinking and blamed the slurred speech on his throat condition. The records also demonstrate that Father notified the case manager that he would not meet on October 30, 2015, "because he had to pay his bills."

Ms. Tipton, also testifying at trial as an expert in the field of social work, explained that the majority of Families Free's efforts with Father and Mother were expended by attempting to schedule parenting education sessions and explaining to the parents reasons for the services and why DCS had secured individuals to enter their home for the services. Although Mother and Father were offered thirty-two sessions for parenting education, twenty-one of those sessions were cancelled. The records also indicate that Mother was hospitalized during several of those offered sessions. Explaining that the parents were not able to demonstrate the skills that Families Free hoped to develop, Ms. Tipton held concerns should the Child be returned to the custody of the parents. Her concerns were primarily due to the financial instability in the home, the parents' inability to properly parent the Child, and the safety of the family members. According to Ms. Tipton, the parents would be unable to safely parent the Child in the foreseeable future because of mental health issues, relational challenges, and lack of commitment to services offered to them.

As explained by Ms. McCartt, the parents had not completed the requirements of their permanency plans to an extent that would permit her to recommend that the parents have unsupervised visitation with the Child or to allow the Child to return to their custody. Although Father had completed his mental health intake with Frontier Health, he did not continue to work with Frontier Health after his intake appointments. Father had failed to accept or work with in-home services, and although he allowed services to enter his home, he did not cooperate with those services. Father attended an AA meeting at least once a month but not once a week as recommended by his assessment. Ms. McCartt related several instances of Father's poor conduct. Specifically, he had yelled at her, made threats of physical harm, and left voice mails cursing her. Moreover, Father had called the DCS attorney inappropriate names and sounded inebriated during various voice mail messages.

Ms. McCartt elucidated her apprehension that the parents had not acknowledged a concern for the Child while in the company of the paternal grandfather, who had been accused of sexually molesting the Child. Although the parents had complied with the no-contact order regarding the grandfather, it was undisputed that he lived on the same street as the parents and served as their primary source of transportation.

As indicated by Ms. McCartt, while the Child had been residing and doing well in her current foster home for more than a year, improvements in her behavior had been observed. Meanwhile, visitation with Mother had ceased, and visitation with Father had been restricted to a therapeutic setting. A motion to suspend Mother's visitation, filed by the guardian *ad litem* and attorney *ad litem* on behalf of the Child, was pending at the time of the termination hearing. An interim order had been entered prohibiting contact between Mother and the Child pending a hearing on the merits.

As the Child's therapist in both individual and family therapy, Theresa Fletcher described the Child to be in a "condition of suffering" when she was removed from the parents' home. The Child struggled with self-care, could not verbalize her emotions, perceived herself as an adult, maintained poor social skills, had suffered the trauma of alleged sexual abuse, and was depressed. Her symptoms were consistent with Post Traumatic Stress Disorder. Throughout the course of her treatment, the Child met with Ms. Fletcher weekly and, as of November 2015, had met with Ms. Fletcher seventy-six times since she had been in DCS custody. Ms. Fletcher discussed the improvements she had observed while the Child attended therapy. These included the Child's ability to better process and verbalize her thoughts and feelings, becoming more confident, and improving her social skills.

Although Ms. Fletcher recognized that the Child loved her parents, she expressed concern regarding whether the Child's needs were being met due to the dysfunction of the family. The home environment was described as a "clear role reversal" between the Child and the parents. Specifically, when Mother was present, the Child was the caregiver. Although a bond existed between the Child and Mother, Ms. Fletcher opined that Mother did not appear to have the ability to properly parent the Child. Ms. Fletcher also reasoned that Mother's capacity to parent was unlikely to be improved due to Mother's significant deterioration over the year prior to trial, including Mother's observed speaking to persons and seeing things not present.

Ms. Fletcher further opined that the resolution of issues between the Child and her parents was limited by Father's lack of sobriety, Mother's mental health, the parents' inability to resolve conflicts effectively, and Father's lack of anger management. Ms. Fletcher would not support the Child's return to the parents' home at that time, indicating that placing the Child back into the parents' environment would cause the Child to "erode." Although having concerns about severing the contact between the parents and the Child, Ms. Fletcher believed the Child's welfare would be enhanced by her remaining in foster care.

At trial, Father submitted photographs of himself and the Child to demonstrate their mutual bond. The photographs also depicted the Child's bedroom and food existing in his home. Regarding the therapeutic visits with the Child and Ms. Fletcher, Father stated that he enjoyed the visits, believing the Child enjoyed them as well.

Admitting that a visit with the Child was cancelled by reason of his alcohol consumption, Father also acknowledged that he had consumed alcohol and was upset when he left a voice mail message for his case manager. Father claimed that he was in such condition because he was "tired of being harassed by The State." According to Father, he had addressed the situation in an effort to seek the Child's return. With reference to his demeanor, Father further testified that although he had thrown a

basketball out of frustration during one visit, he in fact was aiming at the house and not Ms. Rogers.

By Father's account, the AA meetings he had been attending for approximately three months were beneficial. Although he had attempted to attend AA meetings every week, he was not always successful. Father submitted three documents reflecting the AA meetings he did attend. Despite recognizing that AA was a twelve-step program, Father was unable to identify the first step of the program. Furthermore, although he had not obtained a sponsor in the program, he insisted that he had not consumed alcohol in six months.

According to Father, Mother and he intended to continue to reside together. While Father observed Mother speaking to nonexistent people, he blamed Mother's medication for this behavior. Father conceded that Mother would be unable to care for the Child by herself if he was not present. Additionally, although Father had not allowed the paternal grandfather to have contact with the Child, he did not believe the grandfather had sexually assaulted her.

The Child's testimony during trial focused on various issues. She suggested that her relationship with Father was strong and that the therapy sessions were going well. Indicating her love for Mother and a desire to continue seeing her, the Child expressed worry concerning her parents and their well-being. According to the Child, although her grades were "decent" when she resided with her parents, her current performance in school was excellent. The Child described her foster parents as "good to [her]."

As additional evidence, DCS subpoenaed for trial Mother's hospital records from Woodridge. Mother objected to their admission into evidence. The trial court ultimately admitted Mother's hospital records as a trial exhibit.[3]

Independent of the Woodridge hospital records, Mother's and Father's respective medical records from Frontier Health also were admitted into evidence. Neither parent objected to the admission of the Frontier Health records. As a recommendation of his psychological assessment, Father was to participate in individual therapy. Father's Frontier Health records reflect that he appeared for an intake and initial therapy session on March 10 and 12, 2015, and appeared to be frustrated. Reporting to a representative of Frontier Health that he was only required to attend the initial intake appointment, Father declined further treatment.

Mother's Frontier Health records evince a medical history since 2003. Mother was reported as "no show" for her aftercare appointments with Watauga Behavioral

---

[3] The contents of the Woodridge Psychiatric Hospital records have not been included in the Factual and Procedural Background section of this Opinion.

Health Services ("WBHS"), a division of Frontier Health, on November 26, 2013; January 7, 2014; and April 1, 2014. On October 8, 2014, Mother was seen by the Frontier Health Mobile Crisis Response Team. Mother stated at the time that she was depressed and held thoughts about killing her husband. Mother also reported not having taken some of her medication in approximately two months. Consequently, she was referred to the respective Crisis Stabilization Unit ("CSU"). While in the CSU, Mother expressed her willingness to participate in case management services.

On October 9, 2014, Mother participated in a group discussion session. The group facilitator's notes provided that Mother "will continue to work on her goals regarding reduction of symptoms of auditory hallucinations, adjustment difficulties, and mild [intellectual disability], with medication stabilization and compliance, therapy to help increase healthy coping skills, and utilization of healthy coping skills more often to improve the moment, and overall quality of life." On October 10, 2014, Mother attended the treatment group and was alert and engaged during the session. On October 11, 2014, Mother participated in a group therapy session and was discharged from the CSU, with planned aftercare to attend scheduled follow-up appointments at WBHS. On October 21, 2014, Mother failed to appear for her appointment with WBHS.

On October 27, 2014, the case manager with WBHS met with Mother at Woodridge. Mother reported an admission to Woodridge after experiencing increased anxiety and depression. She agreed to participate in case management services at that time. WBHS was to be contacted by Woodridge staff for an appointment upon Mother's discharge. On November 11, 2014, Mother failed to appear for her appointment with WBHS. Subsequently on November 26, 2014, the WBHS case manager again met with Mother at Woodridge. Mother reported having been admitted to the hospital after experiencing suicidal ideations and increasing depression. At that time, Mother agreed to participate in case management services with WBHS. Woodridge staff was to contact the case manager for an appointment upon Mother's discharge. On December 9, 2014, Mother again failed to appear for her WBHS appointment. During a December 23, 2014 meeting with the WBHS case manager at Woodridge, Mother reported having entered Woodridge after experiencing hallucinations of animals and people. Mother again agreed to participate in case management services with WBHS. Woodridge staff were to schedule aftercare appointments upon Mother's discharge, but on December 23, 2014, and January 6, 2015, Mother missed her appointments with WBHS.

When the WBHS case manager again met with Mother at Woodridge on January 12, 2015, Mother reported a Woodridge admission after experiencing both auditory and visual hallucinations. Mother informed the case manager that "she was seeing lots of people, who all were talking, but she could not make out anything they were saying." Mother agreed to participate in case management services at WBHS. The case manager's note indicated that WBHS would be contacted by Woodridge staff for appointments upon

Mother's discharge from Woodridge. On January 27, 2015, Mother again missed her appointment at WBHS.

On February 2, 2015, when the WBHS case manager met with Mother at Woodridge, Mother stated that her hospitalization was due to the "same reason that [she was] always admitted to Woodridge for." The case manager observed Mother to be extremely agitated, with Mother complaining of both auditory and visual hallucinations. Mother again reported a willingness to participate in case management services with WBHS. The case manager's note indicated that Woodridge staff would contact WBHS to schedule appointments upon Mother's discharge. Nonetheless, on February, 10 and 17, 2015, and March 17, 2015, Mother was reported as a "no show" for her appointments. During a July 22, 2015 meeting with the WBHS case manager at Woodridge, Mother reported an admission to Woodridge following a fight with her husband concerning cigarettes. Mother again indicated a willingness to participate in case management services at WBHS.

Following the trial, the court entered a final order on March 22, 2016, terminating Mother's and Father's parental rights to the Child. The court found by clear and convincing evidence that (1) Mother and Father had failed to provide a suitable home, (2) Mother and Father had failed to substantially comply with the requirements of the permanency plans, (3) Mother was mentally incompetent and unable to care for the Child, and (4) the conditions leading to the Child's removal from the home still persisted as to Mother and Father. The trial court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the Child. Mother and Father timely appealed.

## II. Issues Presented

On appeal, Mother presents six issues, which we have restated as follows:

1.      Whether the trial court erred by admitting Mother's hospital records into evidence at trial.

2.      Whether the trial court erred by finding clear and convincing evidence that Mother abandoned the Child by failing to establish a suitable home.

3.      Whether the trial court erred by finding clear and convincing evidence that Mother had substantially failed to comply with the statements of responsibilities in the permanency plans.

4. Whether the trial court erred by finding clear and convincing evidence that the conditions leading to the Child's removal into protective custody persisted.

5. Whether the trial court erred by finding clear and convincing evidence that Mother was mentally incapable of caring for the Child.

6. Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights.

Father presents four issues, which we have likewise restated as follows:

7. Whether the trial court erred by finding clear and convincing evidence that Father abandoned the Child by failing to establish a suitable home.

8. Whether the trial court erred by finding clear and convincing evidence that Father had substantially failed to comply with the statements of responsibilities in the permanency plans.

9. Whether the trial court erred by finding clear and convincing evidence that the conditions leading to the Child's removal into protective custody persisted.

10. Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and

shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as

- 18 -

supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Mother's Woodridge Hospital Records

As a threshold issue, Mother contends that because her Woodridge hospital records were improperly admitted into evidence during trial, the termination of her parental rights should be reversed and remanded for a new trial. Mother objected to the admission of her hospital records on the basis of Tennessee Code Annotated § 68-11-404(a) (2013). Although we conclude that the trial court erred in admitting Mother's hospital records, we determine that error to be harmless because the remaining proof supports by clear and convincing evidence the termination of Mother's parental rights.

Tennessee Code Annotated § 68-11-404 is contained within Part 4 "Hospital Records as Evidence," of Chapter 11, "Health Facilities and Resources," of Title 68, "Health, Safety and Environmental Protection," of the Tennessee Code. The Tennessee Court of Criminal Appeals has recognized that

[t]he main purpose of T.C.A. §§ 68-11-401 et seq. is to provide a procedure for a hospital, where it has no interest in the case, to respond to a subpoena duces tecum for hospital records by filing copies of the records authenticated by affidavit instead of by sending a witness to the hearing with the originals.

*State v. Hutchinson*, C.C.A. No. 887, 1990 WL 99386, at *1 (Tenn. Crim. App. July 19, 1990). Few appellate decisions have addressed the applicability of this statutory scheme to specific situations; however, certain sections of Part 4 have been applied by this Court in termination of parental rights proceedings. *See e.g. In re C.I.J.*, M2006-02192-COA-R3-PT, 2007 WL 2091228, at *4-8 (Tenn. Ct. App. July 17, 2007) (examining the procedural requirements of Tennessee Code Annotated §§ 68-11-402, 403, 405).

The hospital records at issue were subpoenaed by DCS, thereby triggering application of Tennessee Code Annotated § 68-11-401, *et seq.* When hospital records are subpoenaed to court, Tennessee Code Annotated §§ 68-11-402 and -405 allow for the custodian of records to deliver a copy of the records requested directly to the court with an accompanying affidavit authenticating the records, in lieu of the custodian of records appearing personally at trial. The subpoenaed hospital records should be sealed upon

their arrival to the court. *See* Tenn. Code Ann. § 68-11-403 (2013). With reference to sealed envelopes or wrappers, Tennessee Code Annotated § 68-11-403 provides in pertinent part:

> The copy of the records shall be separately enclosed in an inner envelope or wrapper, sealed, with the title and number of the action, name of witness and date of subpoena clearly inscribed on the envelope or wrapper. The sealed envelope or wrapper shall then be enclosed in an outer envelope or wrapper, sealed and directed as follows:
>
>> (1) If the subpoena directs attendance in court, to the clerk of such court or to the judge thereof[.]

Opening the sealed records is controlled by Tennessee Code Annotated § 68-11-404(a), which provides in relevant part:

> (a)(1) Unless the sealed envelope or wrapper is returned to a witness who is to appear personally, the copy of records shall remain sealed and shall be opened only at the time of trial, deposition or other hearing, upon the direction of the judge, court, officer, body or tribunal conducting the proceeding, in the presence of all parties who have appeared in person or by counsel at such trial, deposition or hearing. Before directing that such inner envelope or wrapper be opened, the judge, court, officer, body or tribunal shall first ascertain that either:
>
>> (A) The records have been subpoenaed at the instance of the patient involved or such patient's counsel of record;
>>
>> (B) The patient involved or someone authorized in such patient's behalf to do so for such patient has consented thereto and waived any privilege of confidentiality involved; or
>>
>> (C) The records have been subpoenaed in a criminal proceeding.

DCS, in seeking to admit Mother's hospital records, also relied on Tennessee Rule of Juvenile Procedure 39(e)(5) (2014), which provides:

> All findings of fact shall be based on clear and convincing evidence. Neither the husband-wife, physician-patient, psychologist-patient, or

clergy-penitent privilege shall be grounds for excluding any evidence in termination of parental rights proceedings.[4]

We note at the outset that "admissibility or exclusion of evidence rests within the sound discretion of the trial court which should be reversed only for abuse of that discretion." *See Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984); *see also In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005) ("[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.") (internal citations omitted).

In its written order, the trial court found that "the records from Woodridge Psychiatric Hospital were properly entered into evidence in this cause." In its oral ruling, the trial court ultimately determined that Tennessee Rule of Juvenile Procedure 39(e)(5) dictated the admission of Mother's hospital records and overcame the psychologist-patient privilege. The trial court correctly noted that Rule 39(e)(5), as it existed at the time of trial, provided that the psychologist-patient privilege would not have prevented evidence from being entered in termination proceedings. However, Tennessee Code Annotated § 68-11-404(a) is not predicated on the psychologist-patient privilege addressed by Rule 39(e)(5); instead, Tennessee Code Annotated § 68-11-404(a) instructs trial courts relative to procedure allowing for the admission of a patient's hospital records into evidence. As such, Tennessee Code Annotated § 68-11-404(a) would apply regardless of whether an issue of privilege existed. Inasmuch as the trial court's basis for admitting the hospital records was erroneous, we determine that Mother's hospital records were not properly admitted into evidence. However, relative to the issues presented on appeal, we further determine that the trial court's error in admitting Mother's hospital records into evidence is harmless because the remaining clear and convincing evidence supports the termination of Mother's parental rights.

V. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or

---

[4] Although the Tennessee Rules of Juvenile Procedure were restructured in 2016, this rule was in effect at both the time of the petition's filing and the trial itself.

guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court ultimately determined that the evidence clearly and convincingly supported a finding of four statutory grounds to terminate Mother's parental rights: (1) abandonment for failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, (3) mental incompetence to adequately care for the Child, and (4) persistence of conditions leading to removal of the Child. The trial court also determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Father's parental rights: (1) abandonment for failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of conditions leading to removal of the Child. We will address each statutory ground in turn.

A. Abandonment by Failure to Provide a Suitable Home

The trial court terminated Mother's and Father's parental rights on the statutory ground that they abandoned the Child by failing to provide a suitable home. Tennessee Code Annotated § 36-1-113(g)(1) provides, as a statutory ground for termination:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2016) defines abandonment, in relevant part, as:

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed

- 22 -

finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

As this Court has previously explained:

A "suitable home" means more than adequate "physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). "[A] home may be rendered unsafe and unsuitable by the conduct of its occupants." *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011).

*In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *6 (Tenn. Ct. App. Feb. 1, 2017).

In its final judgment, the trial court enunciated specific findings of fact regarding this statutory ground as follows:

3) The Court finds that the child was previously removed from the home of the Respondents by Order of this Honorable Court and placed into the protective custody of the State of Tennessee, Department of Children's Services.

4) The child was removed from the home of the Respondents and into DCS custody on October 8, 2013. The four (4) months immediately following the removal of the child from the home were from October 8, 2013 to February 8, 2014.

5) The Court finds that, during the four (4) months immediately following the removal from the home, and thereafter, DCS made reasonable efforts to assist the family in providing a suitable home for the child, to wit:

- 23 -

a. The Court finds that, shortly after the removal of the child from the home of the Respondents, a Child and Family Team Meeting was held. The purpose of this meeting was to see if there were any viable relative resources who could serve as placement for the child. However, no relative resources could be located. At this meeting, the Department discussed with the parents the reasons that the child was removed into foster care, including physical abuse, mental health concerns, domestic violence, and substance abuse.

b. The Court finds that there have been several case managers that worked with this family. The Department's case manager was Ms. Jacki McCartt. Ms. McCartt prepared a permanency plan for review and ratification by the Court.

c. During the four (4) months following removal, Ms. McCartt requested a parenting assessment of the parents. However, this assessment was not completed due to the father's refusal to cooperate with services. [Father] was not receptive to any of the services that DCS attempted to offer him during the first four (4) months following removal. This prohibited the parenting assessment from being completed.

d. During the four (4) months following removal, Ms. McCartt attempted to help [Father] complete a psychological assessment and an alcohol and drug assessment. DCS also attempted to put in-home services into the parents' home.

e. During the four (4) months following removal, DCS encouraged the parents to participate in the child's mental health counseling. DCS also met with the parents and set up meetings with them. Additionally, Ms. McCartt notified the parents of court hearings and meetings during the first four (4) months that the child was in DCS custody for foster care.

f. DCS ensured that the child attended weekly case management appointments. DCS also facilitated visitations between the parents and the child. These visitations often took place at the Respondents' home. During these visits, DCS attempted to assist the Respondents in developing appropriate parenting techniques. The Respondents agreed to participate in the child's case management appointments twice a month. The Court notes that these case management appointments were weekly, but that the parents agreed to attend two

(2) times per month. The Court finds that the Respondents did attend the first few case management sessions. However, thereafter, in February of 2014, [Father] stated that he would not attend any further family therapy. The Court further finds that, in fact, [Father] did not resume attending these therapy sessions until six (6) or seven (7) months later. Despite the Respondents' refusal to attend these sessions, DCS continued to keep the parents apprised of the dates, times, and locations, of the child's therapy sessions.

The Court finds that all of the efforts by the Department were reasonable and related to remedying the conditions that brought about removal so that the matter would not progress to a termination of the parents' parental rights. The Court further finds that the Department was reasonable in its efforts to encourage the parents to participate in the services that were being offered to them.

6) The Court finds that there is clear and convincing evidence that the parents made no efforts to provide a suitable home for the minor child during the four months following removal, to wit:

a. During the four (4) months following removal, [Father] refused to allow services to come into the home.

b. As to [Mother], she was living in the home with [Father] during the four (4) months following removal. [Mother] could have allowed services to come into the home, and those services were made available to her. The Court finds that [Mother] could have been given assistance by DCS and other service providers. However, [Mother] never expressed a desire or willingness to accept these services. Rather than availing herself of the services that were being offered to her, she acquiesced to allowing no services to come into the home. The Court also finds that DCS was even willing to offer her services separate and apart from those being offered to [Father]. She could have completed the parenting assessment and parenting education, but she did not.

c. Due to concerns in the home, during the four (4) months following removal, the child's visitation remained supervised. The Court notes that, to date, the child's visitations with her parents have yet to progress to unsupervised contact. The Court finds that the child has been in DCS custody for over two (2) years without any progress towards moving towards unsupervised visitation.

d. The Court finds that [Father] made no changes in his life during the four (4) months following removal. He continued to have unaddressed substance abuse and alcohol dependency issues. There were ongoing concerns with his parenting. These issues led to the removal of the child from the home and, by [Father's] refusal to allow services in the home, they still continued during the four (4) months following removal.

e. As to [Mother], she continued to have ongoing mental health issues during the four (4) months following removal.

7) The Court finds that the [Mother's and Father's] failure to make even minimal efforts to improve their home and personal condition demonstrates a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

8) DCS has proven, by clear and convincing evidence, the ground of abandonment by failure to provide a suitable home against [Mother] and [Father].

Upon careful and thorough review, we determine that a preponderance of the evidence supports the trial court's finding by clear and convincing evidence that Mother and Father had abandoned the Child by failing to provide a suitable home for the Child. We now address Mother's and Father's respective issues regarding this statutory ground.

1. Mother

Mother contends that the trial court erred by finding that DCS made reasonable efforts to reunite her with the Child within the four months following the Child's removal from the home. She also contends that the court erred in finding that she had not made reasonable efforts to provide a suitable home within the four months following removal. Mother concedes that DCS established by clear and convincing evidence that the Child was removed by reason of DCS's petition upon which the trial court adjudicated the Child to be dependent and neglected. Moreover, she further concedes that the trial court found that the circumstances of the Child's situation prevented DCS from making reasonable efforts prior to the Child's removal from the home. Mother also does not dispute that she was residing with Father and the Child at the time of the Child's removal.

In her principal brief, Mother faults DCS in failing to address her mental health issues and for the case managers' failures to request a clinical parenting assessment, which would have included a mental health component administered by a mental health professional. However, the record reflects that DCS included in Mother's permanency plan the requirement that Mother complete a psychological assessment and follow all

recommendations, in addition to the parenting assessment completed. Ms. Tipton testified that DCS will often request a general parenting assessment in combination with a psychological assessment instead of a clinical parenting assessment and that the results of the psychological assessment can substitute for that otherwise provided in the clinical parenting assessment. During the ratification hearing for the June 2014 permanency plan, Mother objected to the action step on the permanency plan requiring her to complete the psychological evaluation. Although the trial court directed the requirement of the psychological assessment be stricken from the plan, Mother was required to continue in her case management with Frontier Health. Mother's objection to the requirement of a psychological assessment in the trial court during ratification of the permanency plan with the later associated argument that DCS failed to request a parenting assessment with a psychological component is unavailing. Furthermore, Frontier Health records reflect that Mother was not compliant with her outpatient case management at WBHS. Therefore, we determine this contention by Mother to be without merit.

Ms. McCartt testified concerning the efforts DCS made with the family during the initial four months after the Child was removed from the parents' home. DCS convened an initial CFTM, during which DCS staff attempted to locate an appropriate family placement. During that meeting, the specific reasons for the Child's removal were discussed with the parents. DCS requested a parenting assessment in November 2013, which Mother did not complete until June 2014. Mother never completed the recommendations from that assessment during the pendency of the case. DCS provided the Child with mental health counseling, which the parents were encouraged to attend. Ms. Shipley testified that the parents did attend two or three sessions before Father informed her in February 2014 that he would not be attending therapy again. According to Ms. Shipley, Mother also did not attend therapy after Father stopped attending. Ms. Shipley testified that although Mother did attend visits with the child, she was not engaged with the Child during those visits. As explained by Ms. McCartt, DCS offered Mother services to assist in remedying the reasons the Child was removed from the home, but Mother did not accept those services. Mother further asserts that she was compliant with her mental health services; however, her records from WBHS reflect otherwise.

Mother further argues that she was living with Father during the four months after the removal and that there were no environmental concerns with the parents' home. However, a suitable home requires more than just an adequate physical place for the Child to reside. *See In re A.D.A.*, 84 S.W.3d at 599. Despite efforts by DCS, Mother and Father had failed to address the reasons that the Child was removed from the home. Dr. Lane testified that the reasons for removal had not been addressed by the parents and still remained at the time of trial. Upon a thorough review of the record before this Court, excluding Mother's Woodridge hospital records, we conclude that the evidence preponderates in favor of the trial court's finding, by clear and convincing evidence, that Mother abandoned the Child by failing to provide a suitable home.

2.  Father

Father argues that the trial court erred by determining that he had not made reasonable efforts to reunite with the Child in the four months following removal of the Child from the home.  Having determined that the trial court did not err in finding that DCS made reasonable efforts as to Mother, we take note here of those efforts, described in the preceding section of this Opinion, that included Father.  Additionally, DCS requested a parenting assessment in November 2013, which Father did not complete until June 2014.  DCS also requested a psychological assessment and alcohol and drug assessment for Father.  Ms. Shipley articulated that Father did attend two or three sessions before informing her in February 2014 that he would not be attending therapy again.  Father did not attend therapy until several months later.  Father did, however, participate in visits with the Child during this time.

According to Ms. McCartt, Father was offered services to assist him in remedying the reasons the Child was removed from the home; however, Father declined these services.  According to Ms. Tipton, because Father refused to participate with service providers, he could not adequately parent the Child in the foreseeable future.  Upon a thorough review of the record before this Court, we conclude that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Father abandoned the Child by failing to provide a suitable home.

B.  Substantial Noncompliance with Permanency Plans

The trial court also terminated Mother's and Father's parental rights on the statutory ground that they had failed to substantially comply with the reasonable responsibilities set out in their permanency plans.  Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2)  There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its final judgment, the trial court included specific findings of fact regarding this statutory ground as follows:

> 10)  The Court finds that the parents have been substantially noncompliant with the tasks and responsibilities set out for them in the permanency plans.

> 11)  The minor child's first permanency plan contained a goal target date of December 31, 2014.  This permanency plan contained the following tasks for the parents:

a. Complete a parenting assessment and follow all recommendations stemming therefrom;

b. Cooperate with in-home service providers and any recommendations they may have;

c. Not allow the minor child around her grandfather, Robert G[.];

d. Participate in the minor child's therapy and family therapy upon request of the therapists;

e. Be open and honest during therapy sessions with the child;

f. Work on communications skills during family therapy;

g. Engage in visitations with the minor child;

h. As to [Father], complete an alcohol and drug assessment and follow all recommendations stemming therefrom; and

i. As to [Father], complete a psychological assessment and follow any recommendations stemming therefrom.

12) The Court finds that the parents have consistently demonstrated that they can complete certain assessments, but then do not follow the recommendations from the assessments.

13) In addition to preparing the permanency plan, DCS also went over the tasks contained in the plan with the parents.

14) At the ratification hearing for the initial permanency plan, counsel for the mother objected to the requirement that she complete a psychological assessment in that she was engaged in mental health services through Frontier Health. Based upon the mother's objection, this task was removed from the permanency plan as a task for the mother. However, she was ordered to continue with her case management through Frontier Health.

15) A second permanency plan was prepared by DCS and ratified by the Court on January 12, 2015. This second plan contained the same tasks that were contained in the first permanency plan, but incorporated the recommendations of the parents' assessments.

16) The Court finds that the parents have been substantially noncompliant with the permanency plan, to wit:

BOTH PARENTS COMPLETED A PARENTING ASSESSMENT, BUT DID NOT COMPLY WITH THE RECOMMENDATIONS THAT STEMMED FROM IT.

17) As to [Father], from the outset of the case, he was not cooperative with the parenting assessment process. During the narrative interview, he was not cooperative with the parenting assessor. He was resistant to questioning. He stated he had been involved with DCS thirteen (13) different times. When asked to describe[] his personality, he stated that he was "hot tempered sometimes when people keeps on messing with me." The father's parenting assessment noted that he did not follow through on directives to the child. The assessor also observed that there was minimal interaction between the father and the child and no observed nurturing behavior. The parenting assessment further noted that the father was at high risk for inappropriate parenting. Additionally, he constantly minimized the situation and stressors that led to the family's circumstances. [Father] also scored very low on the Slosson Intelligence Test, placing him in the moderately mentally challenged range.

18) Based upon the parenting assessment, the following recommendations were made for [Father]: (1) Intensive parenting education and (2) family counseling.

19) The Court finds that [Mother] was more cooperative with the parenting assessment than was her husband. The parenting assessment noted that [Mother] had been to Woodridge Psychiatric Hospital "two (2) or three (3) different times" in 2014. She was never engaged and was observed to be extremely passive in her parenting of the child. She was distant, exhibited no nurturing behavior and demonstrated minimal interaction or interest in the visit with the child. The mother did not display any warmth or nurturing behavior. She basically seemed to be disconnected during the visitations with the child. She scored at a high risk to engage in inappropriate parenting. She was observed to be very self-focused and was more focused on herself than on the child. The mother also scored very low on the Slosson Intelligence Scale, placing her in the moderately mentally challenged range of intelligence.

20) The mother's parenting assessment contained the following recommendations: (1) intensive parenting education; (2) family

counseling; and (3) family support services (if the child were to return home).

21) The Court finds that both parents were noncompliant with the recommendations set out for them in the parenting assessment.

22) The parents were to cooperate with in-home services to address the concerns noted in the parenting assessment. They did not, and would not, cooperate with these services. The parents were also to cooperate with parenting education. They did not, and would not, cooperate with these services either.

23) The Court finds that Families Free provided parenting education to the family at different points in the progression of the case. The Court finds that the Respondents would cancel many of these therapy sessions, to the point that, out of thirty-four (34) possible appointments, they cancelled twenty-one (21) of them.

24) The Court finds that, after Families Free was contacted to work with the family, the father was very upset that Families Free had been assigned to the case. In November of 2014, [Father] reported that he had already done everything he was told to do before and that he did not understand why he had to "do all this s*** again." On another home visit by Families Free, [Father] stated that it was not a good idea for Families Free to come to the family home on that date in that [Mother] had "started talking out of her head again."

25) In December of 2014, Families Free again went to the [parents'] home to work on parenting education, to no avail.

26) In January of 2015, Families Free again attempted to meet with the family to work on parenting education. However, time and time again, the parents continued to cancel these appointments.

27) On January 28, 2015, Families Free met with [Father]. When the Families Free worker arrived at the home, the father began to scream, "You f****** people. Do whatever the h*** you want to do." The father began yelling loudly about the child's case manager, Jacki McCartt, who was trying to assist him by providing services. He proceeded to curse and threaten Ms. McCartt, DCS, the Court, and the entire legal proceeding. He stated, "I'm going to go up there and blow up that g****** DCS building and kill that little b****, Jacki."[] He also exclaimed, "F*** yeah and that g****** Judge, too." The Court finds that these were the situations that

DCS and in-home providers had to deal with when attempting to help the parents. The Court finds that this was the same situation from which the child was removed, and that she was in a condition of want and suffering at the time of removal by this Honorable Court.

28) By the end of January 2015, it was difficult to identify any strengths for the family. They continued to have outbursts of anger. They continued to refuse to accept any services into the home. Due to his refusal to accept services, Families Free was unable to engage [Father] in the parenting education curriculum. As to [Mother], Families Free was also unable to provide her with parenting education because of her significant mental health issues. The Court finds that the mother acquiesced to all that was going on in the home and did nothing to remove herself from that situation.

29) From February 2015 to July 2015, Families Free services were not offered because the parents were not willing to accept them into their home. The Court finds that [Father] continued to refuse any services into the home during that time. However, despite these issues, DCS continued to attempt to provide help and services to the family, but was unable to engage the family during that time.

30) The Court is concerned with the family situation, in that, when most people come into the type of situation that leads to a child's removal from their home, they can normally make progress in addressing issues of concern in four (4) to six (6) months. The Court also finds that Ms. Tipton testified that this case is atypical from other cases, in that, in her experience, most parents are able to successfully complete a parenting education curriculum in four (4) to six (6) months. Here, as of the date of the filing of the petition, Families Free and DCS had worked a total of fourteen (14) months with this family to assist them in remedying the issues that led to removal. Yet, despite these efforts, the parents have not made any substantial progress in completing any of the tasks set out for them in the permanency plan. The Court finds that Families Free attempted to provide the services that could have helped the parents in addressing the issues of concern in their lives so that the child could return home. Yet, despite these efforts, the parents cancelled twenty-one (21) of the possible thirty-four (34) appointments that were offered to them by Families Free.

THE PARENTS WERE UNABLE TO ADDRESS THE ISSUES THAT LED TO THE CHILD'S REMOVAL IN FAMILY THERAPY.

31)  Both parents were ordered to attend the minor child's therapy appointments.  While they attended some of the family counseling sessions, they did not complete this therapy regimen.

32)  The Court finds that the goals of family therapy were to address (1) the family's beliefs around the alleged sexual abuse and any safety issues associated therewith; (2) emotional management; and (3) the child's role in the family.

33)  At the time of removal, the child's role in the family had become "parentified," such that she was responsible for the care of her parents and, in particular, her mother.

34)  Due to some erosion of the mother's own mental health needs, the child's therapist requested that the mother discontinue participation in family therapy.  After the mother was asked to leave therapy, the father continued to participate "intermittently" with family therapy.  However, this therapy was of limited benefit due to [Father's] own choices and inaction.

35)  The Court finds that both parents have been unable to contribute to the child's wellbeing.  The Court does note that, a year later, there has been a slight improvement in the father's interactions and communication with the child.  However, the Court also finds that, despite this slight improvement, mental health providers and other professionals are unable to recommend that the child return home or begin unsupervised visitations with her parents.

36)  [Father] himself testified that there were many things that he had not learned about in therapy with the child, including emotional management and the child's role in the family.

WHILE THE PARENTS DID PARTICIPATE IN VISITATION WITH THE CHILD, THESE VISITS WERE OFTEN PROBLEMATIC AND PLAGUED WITH DYSFUNCTION.

37)  The Court finds that visitation was ordered between the parents and the minor child.  The Court finds that there were many problems during these visitations.

38)  The Court finds that, at times, the visitations between the parents and the child went well.  However, at other times, issues of dysfunction arose. Specifically, the Court finds that, on several instances, [Father] appeared at

visitations visibly intoxicated. Specifically, when workers and the child would arrive at the home, [Father] would become upset and began cursing. He would yell and use a vulgar hand gesture towards the minor child and the workers who were present at that time. The Court finds that these occurrences were traumatic for the child, in that she had to see her father in this condition.

39) The Court finds that, during a visitation with the child in May of 2014, [Father] appeared angry, loud, and aggressive. He began screaming at the child and exclaimed, "Fine then, you can just stay in foster care." He also began using inappropriate language, profanity, and used inappropriate hand gestures towards the visitation supervisor, Ms. Shipley, and the minor child.

40) During her parenting time with the child, [Mother] was not an active participant in visitations. She barely spoke to the child during the visitations and hardly interacted with the child at all. Further, she often was not present at visitations due to her being hospitalized at Woodridge Psychiatric Hospital.

41) The Court finds that, at times, the visitations between the parents and the minor child were a detriment to the child.

42) The Court finds that [Father] discussed inappropriate topics with the child during visitations. Specifically, the Court finds that, case workers testified that they overheard the father tell the child not to cooperate with "the State" and not to take her prescribed psychotropic medications. All of these issues arose when [Father] was supposed to be having appropriate visitation and interaction with the child. The Court finds that this is indicative of how [Father] acts and how the home situation continues to deteriorate.

43) The Court finds that, as to [Mother], during the visitations, she would often sleep through much of the visit. When she was awake, she did not interact with the child at all. The Court also notes that Ms. Shipley testified that she never observed the mother interact with, or try to parent, the minor child during visitations.

44) The Court finds that [Father] continued to have anger issues that were not addressed or remedied. These anger issues culminated in a visitation at which he threw a basketball at the child's in-home worker.

45) The Court finds that, on September 16, 2015, [Father] brought [Mother] to a visitation at the park and appeared to be impaired. His

speech was slurred. He was sweating. His face was red and he was very loud.

46) The Court finds that all of these issues complicated the situation and made visitation unsuccessful between the child and her parents.

THE FATHER COMPLETED AN ALCOHOL AND DRUG ASSESSMENT BUT DID NOT COMPLY WITH THE RECOMMENDATIONS STEMMING THEREFROM.

47) The Court finds that [Father] testified that he had completed an alcohol and drug assessment. However, he did not comply with the recommendations from this assessment. Specifically, the Court finds that [Father] testified that he had completed a few Alcoholics Anonymous (AA) meetings, and that he attended these meetings approximately once per month. However, the Court finds that, per the recommendations of the assessment, [Father] should have been attending these meetings four (4) times per month. Further, the Court finds that [Father] testified he did not know the first step of the twelve (12) step program. He also does not have an AA sponsor.

48) The Court finds that, with the exception of attending some AA meetings, [Father] did not complete any of the recommendations of his alcohol and drug assessment. The Court finds that this again demonstrates his substantial noncompliance with the permanency plan.

THE MOTHER WAS NONCOMPLIANT WITH CASE MANAGEMENT.

49) The Court finds that the mother was ordered to comply with her case management through Frontier Health. . . .

THE PARENTS HAVE BEEN SUBSTANTIALLY NONCOMPLIANT WITH THE TASKS SET OUT FOR THEM IN THE PERMANENCY PLANS.

50) The Court finds, by clear and convincing evidence, that, as a result of the actions by the Respondents, they have never been able to move beyond the completion of their initial assessments to address the underlying issues of dependency and neglect that exist in their lives as to this child. In fact, since the child's removal over two years ago, they have never been able to progress to unsupervised visitation with her.

51) DCS has proven, by clear and convincing evidence, the ground of substantial noncompliance against [Father] and [Mother].

(Emphasis in original.) Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings that Mother and Father failed to substantially comply with the reasonable responsibilities of their permanency plans. We will separately address Mother's and Father's respective issues regarding this statutory ground.

### 1. Mother

Mother contends that the trial court failed to specifically find that the permanency plan requirements were reasonable and related to remedying the conditions necessitating foster care. However, following the June 2014 permanency plan ratification, the trial court entered an order finding that "the tasks in the Permanency Plan are reasonable and related to achieving permanency for this child and towards remedying the reasons that the child requires foster care." After the January 2015 permanency plan ratification, the trial court subsequently entered an order on January 27, 2015, finding that "the tasks in the Permanency Plan are reasonable and related to achieving permanency for this child and towards remedying the reasons that the child requires foster care." As the trial court clearly did make findings that the permanency plans were reasonable and related to remedying the reasons why the Child requires foster care, we determine Mother's argument to be without merit.

Alternatively, Mother argues that she "completed enough of the tasks required of her in the permanency plan" so as to preclude a finding that she was substantially noncompliant with the permanency plans. Mother was required to complete a parenting assessment and follow all recommendations, cooperate with in-home services, allow no contact between the Child and the paternal grandfather, participate in the Child's therapy sessions, be open and honest during therapy sessions, develop communications skills during therapy sessions, and engage in visits with the Child.

Mother did complete her parenting assessment; however, she failed to follow through with the recommendations from the assessment. The parenting assessment recommended that Mother complete intensive parenting education. Ms. Tipton related that out of approximately thirty-two parenting education sessions offered, the parents had cancelled twenty-one of them. Ms. Rogers's testimony established that Mother was not engaged during the visits with the Child but would instead sleep through many of the visits. Mother attended two or three of the Child's therapy sessions, but stopped attending those sessions in February 2014. Mother failed to attend the sessions until several months had passed. Upon our careful review of the record, excluding Mother's Woodridge hospital records, we conclude that the evidence does not preponderate against

the trial court's finding by clear and convincing evidence that Mother failed to substantially comply with the reasonable requirements of the permanency plans.

## 2. Father

Father similarly contends that the trial court failed to make a finding that the requirements in the permanency plans were reasonable and related to remedying the conditions that necessitated foster care. Having previously determined that the trial court explicitly found the permanency plans to be reasonable and related to remedying the reasons why the Child required foster care, we determine Father's argument in this regard to be without merit.

Alternatively, Father argues that he "completed enough of the tasks required of him in the permanency plan" so as to preclude a finding that he was substantially noncompliant. Father was required to complete a parenting assessment and follow all recommendations, cooperate with in-home services, allow no contact between the Child and the paternal grandfather, participate in the Child's therapy sessions, be open and honest during therapy sessions, develop communications skills during therapy sessions, engage in visits with the Child, complete an alcohol and drug assessment and follow all recommendations, and complete a psychological assessment and follow all recommendations.

The record establishes that Father was engaged in visits with the Child. Father did complete his parenting assessment; however, he failed to follow through with the assessment recommendations. The assessor recommended that Father complete intensive parenting education. As previously noted, the parents cancelled twenty-one out of approximately thirty-two parenting education sessions offered. Father attended two or three of the Child's therapy sessions but stopped attending in February 2014. Following a court hearing in February 2014, Father informed Ms. Shipley that he would not attend any more therapy sessions for the Child. As indicated, Father did not begin attending those sessions again until several months had passed. Although Father completed his psychological assessment, he did not complete the recommendations from that assessment. Father attended an intake and initial therapy session with Frontier Health but declined any further treatment. Father did complete his alcohol and drug assessment, but did not complete the recommendations of that assessment. Father attended AA meetings approximately twice per month but did not attend weekly as recommended. The trial court found and the evidence supports that Father also did not fully participate in the program. Significantly, Father did not have a sponsor and, when questioned, was unable to describe the first step of the AA twelve-step program. Upon our careful review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father failed to substantially comply with the requirements of the permanency plans.

## C. Persistence of Conditions

The trial court also terminated Mother's and Father's parental rights on the statutory ground that the conditions leading to the Child's removal from the parents' home still persisted. On appeal, Father and Mother each respectively argue that the trial court erred by determining that the conditions that led to removal of the Child from the home still existed. Father also argues that "the trial court erred by finding that the Child's chances of being integrated into a permanent home were diminished by [Father's] conduct and not the lack of a permanent placement on the part of DCS."

Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Although neither party raises the issue of whether the Child had been removed from the parents' home by court order for a period of at least six months, due to the fundamental constitutional interest involved, we shall address this issue. *See In re Carrington H.*, 483 S.W.3d at 522-24.

In the case of *In re Audrey S.*, 182 S.W.3d 838, 875 (Tenn. Ct. App. 2005), this Court determined that a temporary custody order resulting from a preliminary hearing was not sufficient to satisfy the requirement that the child had been removed from the home of the parent <u>by order of a court</u> for six months. The *Audrey S.* Court determined:

The March 28, 1996 temporary custody order resulted from a preliminary hearing, not an adjudicatory hearing, and the restraining order was designed merely to preserve the status quo in advance of the preliminary hearing. The temporary custody order contains an implicit judicial finding of probable cause that Audrey S. was dependent, neglected, or abused. It does not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused. The juvenile court never held an adjudicatory hearing on [the grandmother's] petition for temporary custody of Audrey S., and there is no other court order in the record prior to the filing of the joint termination petition that reflects a finding of dependency, neglect, or abuse with respect to Audrey S. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating [the mother's] parental rights to Audrey S.

*Id*.

In the case at bar, the Child was removed from the home of the parents on October 8, 2013, by operation of an "*Ex Parte* Protective Custody Order." In the ex parte order, the trial court stated: "There is probable cause to believe that [the Child] is dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(b)(12)." A preliminary hearing was scheduled for October 10, 2013, but was continued until October 28, 2013, to allow the parents to be appointed counsel. Upon conclusion of the adjudicatory hearing on May 29, 2014, the trial court found the Child to be dependent and neglected in the care of her parents. An order reflecting this finding was entered by the trial court on June 11, 2014. Following the October 8, 2013 removal order but prior to the adjudicatory hearing order entered on June 11, 2014, no court order appears of record evincing a finding by the trial court of dependency, neglect, or abuse with respect to the Child. DCS filed a petition to terminate the parental rights of the parents on November 19, 2014. Because six months had not elapsed between the date of the adjudicatory hearing order and the filing of the termination petition, we must reverse the trial court's determination regarding the statutory ground of persistence of conditions.

### D. Mental Incompetence

The trial court also terminated Mother's parental rights on the statutory ground that she was mentally incompetent to adequately provide for the further care of the Child. Mother contends that the trial court erred by terminating her parental rights based upon this statutory ground. Tennessee Code Annotated § 36-1-113(g)(8) provides regarding this additional ground for termination:

(8)(A)  The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall

- 39 -

have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

The General Assembly's exclusion of willfulness from this statutory ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008). If willfulness were required in order to terminate parental rights for mental incompetence, "an obvious result . . . is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

This Court has rejected the argument that the ground of mental incompetence is reserved only for parents who have "a condition for which 'no amount of intervention can assist'" and instead has affirmed the termination of parental rights for mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenia disorder. *See id.* at 337-39 (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence, although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008) (affirming a termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v.*

*M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at \*10 (Tenn. Ct. App. Jan. 17, 2007) (affirming a termination of parental rights on the statutory ground of mental incompetence based on a diagnosis of adjustment disorder with anxiety and depressed mood, as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows in relevant part:

65) The Court finds that there is clear and convincing evidence that [Mother] is incompetent to provide adequately for the further care and supervision of the child because her mental health is impaired and is so likely to remain impaired to a level that she will probably not be able to resume the care and responsibility in the near future.

66) The Court finds that Ms. Rogers testified that, on multiple occasions, she has observed the mother speaking to individuals who were not in the room. She has observed the mother talking to spaces in the home and under the porch of the family home. [Mother] told Ms. Rogers that she sees people and talks to people that Ms. Rogers was not seeing.

67) Dr. Lane testified that the mother's parenting assessment noted that it was questionable whether [Mother] would be able to parent the child.

68) The Court finds that the mother's parenting style is passive, disconnected, and disengaged, at best.

69) The Court finds that, during visitation, the mother was very disconnected and appeared to lack any warmth or nurturing towards the child.

70) The Court finds, by clear and convincing evidence, that the mother's mental health has not improved. Specifically, the Court finds that Ms. Tipton testified that, in her expert opinion, [Mother] is not going to be able to parent the child in the future. The Court also finds that the mother is unlikely to be able to parent this child in the future.

71) During the child's family therapy sessions, the mother was observed . . . in a state of active psychosis. She was hearing voices and was having conversations with people who were not in the room. While in therapy, she was picking, and eating, bugs that were on the couch. The minor child was present when these episodes occurred.

72)  The Court finds that, when the minor child is with her mother, the minor child is the caregiver.

73)  Ms. Fletcher testified that, in her opinion, the mother does not seem to have the ability to parent the child.

74)  Ms. Fletcher testified that, in her opinion, the mother cannot parent the child.

75)  The Court finds, by clear and convincing evidence, that the mother's current condition presently impairs the mother to the point that it is unlikely that she will be able to resume being a parent or have the capability to parent the child.

* * *

89)  The Court finds that the mother's lack of compliance was an ongoing issue in this matter.  The Court finds that this lack of compliance with the directives of medical professionals has resulted in thirteen (13) hospitalizations in a psychiatric facility.

90)  DCS has proven, by clear and convincing evidence, the ground of mental incompetence against Respondent [Mother].

Having determined that the trial court erred by admitting the Woodridge hospital records into evidence at trial, we have omitted the court's findings as to those records here and cannot consider them in reviewing the court's conclusions.  We determine, however, that the trial court's error in admitting Mother's hospital records into evidence was harmless because the remaining evidence supports by a clear and convincing standard the trial court's finding that Mother is mentally incompetent to adequately provide for the further care of the Child.

Numerous witnesses observed Mother appearing to speak to people who were not present.  Ms. Rogers observed Mother on multiple occasions speaking to nonexistent persons in the home or under the porch.  Frontier Health records establish that Mother reported to the WBHS case manager multiple times that she was committed to Woodridge hospital after observing people and hearing voices that were not actually present.  On one occasion, Mother described to the Families Free case manager seeing and hearing "bad men."  Although Father blamed the effects of Mother's medicine, he also testified that he had observed Mother speaking to people who were not present.  In family therapy, Ms. Fletcher observed Mother speak to individuals who were not in the room and interact with nonexistent objects.

Additionally, Frontier Health records reflect that at times Mother had reported experiencing homicidal ideations toward her husband, suicidal ideations, increased depression, and both visual and auditory hallucinations. Mother's Frontier Health records also show that Mother failed to comply with her mental health appointments at WBHS. The records indicate multiple admissions to Woodridge, which resulted in Woodridge scheduling mental health appointments for Mother with WBHS following her discharge. Each time, although Mother would agree to participate in case management after her release from the hospital, she failed to appear for her mental health appointments with WBHS.

Ms. Fletcher explained that a role reversal between Mother and the Child occurred such that when Mother was present, the Child was the caregiver for Mother. This created an unhealthy situation for the Child. Although Ms. Fletcher recognized a bond between the Child and Mother, she opined that Mother did not appear to have the ability to parent the Child. Ms. Tipton also indicated her concerns that Mother would be unable to safely parent the Child in the foreseeable future, due in large part to her mental health issues.

The evidence supports the trial court's finding that Mother's parenting style was "passive, disconnected, and disengaged, at best." Ms. Rogers testified that Mother did not engage with the Child and would sometimes sleep during the visits. Additionally, Dr. Lane indicated that Mother did not appear to be invested in the Child or her well-being. According to Dr. Lane, Mother did not display a warmth or nurturing behavior toward the Child and seemed disconnected from the visit. The relationship concerned Dr. Lane because Mother was vastly focused on herself despite the Child's absence from the parents' home. According to Dr. Lane, Mother might not be able to adequately parent the Child.

Following a thorough review of the record and excluding Mother's Woodridge hospital records, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother was mentally incompetent to adequately provide for the care and supervision of the Child. Mother's mental condition is presently and is likely to remain so impaired that it is unlikely Mother will be able to assume care of and responsibility for the Child in the near future. Therefore, we affirm the termination of Mother's parental rights based on the statutory ground of mental incompetence.

## VI. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at

507, 523 (Tenn. 2016) ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) (Supp. 2016) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or

guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As this Court has explained:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted).

The trial court analyzed the best interest factors, specifying in its final judgment the following findings of fact in relevant part:

THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(1) ARE APPLICABLE TO THIS MATTER.

92) It is in the best interest of the minor child for termination to be granted as to [Mother and Father] because they have not made changes in their conduct or circumstances that would make it safe for the child to go home. Ms. McCartt testified that the parents had made no changes such that the child could go home. These conditions have continued throughout the proceedings and continue to be an issue in the home at this time. The Court finds that neither parent has remedied their condition to such an extent that the child can return home to live with them.

93) Dr. Lane testified that, in her expert opinion, the parents' investment in this child and their ability to connect with her and build a meaningful relationship should have happened by the time she was thirteen (13) years of age. This did not happen.

94) Ms. Tipton testified that, in her expert opinion, and due to the ongoing mental health issues, relational challenges, and lack of commitment to the services that are being offered to them, the parents will likely be unable to safely and effective[ly] parent this child in the foreseeable future. As to [Father], Ms. Tipton also testified that the father has been uncooperative with Families Free services. The mother was also unwilling and/or unable to work with services.

95) The Court finds that Ms. Fletcher testified that, due to concerns for the child's safety and wellbeing, she is unable to support even unsupervised visitations between the parents and the child at this time. In fact, Ms. Fletcher testified that the child's progress would erode if she were placed back in the family home.

96) In sum, the Court finds that this factor weighs in favor of termination against the parents.

THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(2) ARE APPLICABLE TO THIS MATTER.

97) It is in the child's best interests for termination to be granted as to [Mother and Father], because they have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. The Court finds that, despite all of the State's efforts to help them, the parents have not made any lasting change in their lives or conduct.

98) The Court finds that DCS has made reasonable efforts to assist [Mother and Father] in addressing the issues that led to removal. The Court specifically finds that DCS funded a parenting assessment for [Mother and Father], at no cost to themselves. After these assessments were completed, DCS attempted to assist the [Mother and Father] in complying with the recommendations set out therein. Further, DCS placed in-home services into the parents' home to assist them with parenting education. DCS selected in-home parenting education for the parents through Families Free because the parents indicated that transportation was an issue for them. All of these efforts were to no avail.

99) In sum, the Court finds that this factor weighs in favor of termination and against the parents.

## THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(3) ARE NOT APPLICABLE TO THIS MATTER.

100) The Court finds that the issue of whether the parents have participated in regular visitation with the child does not weigh in favor of, or against, termination. Specifically, the Court finds that, as to the mother, she has been ordered to have no visitation with the child. As to the father, sometimes his visitations with the child go well. At other times, the visits are terrible and horrendous.

## THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(4) ARE APPLICABLE TO THIS MATTER.

101) It is in the child's best interests for termination to be granted as to the Respondents, because there is no meaningful parent/child relationship between themselves and the child.

102) The Court finds that the minor child often acts as the parent in this case. There is not a great deal of interaction between [Mother] and the child during visitation.

103) The Court finds that the parents have not demonstrated an interest in the welfare of the child. The parents have demonstrated a complete lack of empathy for the child.

104) Ms. Fletcher testified that the interactions between the child and her father have recently improved. However, Ms. Fletcher also noted that therapy is an isolated setting and that she is not sure that this change would [be] maintained in the home setting. Ms. Fletcher also noted that the mother's absence from therapy has helped [the Child's] relationship with her father to some extent.

105) The Court finds that the parents are still married and that, when they are together, they make the home situation and environment worse. When the parents are apart, and when the father is in a therapeutic setting, the situation is improved.

106) The Court finds that there is some form of attachment between the parents and the minor child. However, Ms. Fletcher noted that, the family roles and system in the [Mother's and Father's] home has made it an unhealthy situation for the child. The Court finds that, while there is an emotional connection between the child and the parents, this does not mean that it is an appropriate parenting situation.

107)    In sum, the Court finds that there is no meaningful relationship between the child and her parents.  Thus, the Court finds that this factor weighs in favor of termination and against the parents.

THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(5) ARE APPLICABLE TO THIS MATTER.

108)    It is in the child's best interests for termination to be granted as to [Mother and Father], because changing caregivers at this stage of the child's life would have a detrimental effect on her.

109)    Ms. McCartt testified that, based upon the minor child's therapeutic needs, she was concerned that changing her caregivers would negatively impact the child.

110)    Ms. McCartt testified that the child is doing very well in her current foster home.  She has been in this foster home for at least one (1) year.

111)    At the time of removal, the child had some significant behavioral problems.  Ms. McCartt testified that these behaviors have improved since she came into DCS custody.

112)    Ms. Rogers testified that the minor child is doing well in her current foster home.  She is doing well in school.

113)    Ms. Fletcher testified that she began seeing the minor child once a week for therapy in December 2013.  She has met with the child approximately seventy-six (76) times since she entered DCS custody.  Since the child entered therapy, she is more able to verbalize her thoughts and feelings.  She can process stressful situations much better than she could when she entered therapy.  She has improved social skills.  She has improved self-esteem.  She is involved in ROTC.  She is more confident.

114)    In sum, the Court finds that this fa[ctor] weighs in favor of termination and against the parents.

THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(6) ARE APPLICABLE TO THIS MATTER.

115)    It is in the child's best interests for termination to be granted as to [Mother and Father], because they have abused and neglected the minor child at issue in this cause.

116) The Court finds that, on May 29, 2014, the child was found to be a dependent and neglected child. At this hearing, the Court found that the child was in a condition of suffering in the care of her parents. At that time, she suffered from the trauma of sexual abuse. She was a very depressed and fragile child. She also struggled with self-care.

117) At the adjudicatory hearing, Ms. Fletcher testified that the child's behaviors were symptoms and coping mechanisms of broader issues of abuse and neglect that she had suffered in the parents' home.

118) Ms. Fletcher testified that, at the time of removal, the child presented with symptoms that were consistent with post-traumatic stress disorder.

119) In sum, the Court finds that this factor weighs in favor of termination and against the parents.

THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(7) ARE APPLICABLE TO THIS MATTER.

120) It is in the child's best interest for termination to be granted as to [Father] because he abuses alcohol, rendering him consistently unable to care for the child in a safe and stable manner.

121) The Court finds that alcohol has been a big problem in this case. The Court finds that the father's issues of substance abuse are ongoing. He continues to abuse alcohol which negatively impacts his parenting of the child. Further, he continues to abuse alcohol even when the child is present, such that it is unsafe for her to be around him. This compromises the safety and overall propriety of the home environment.

122) Ms. McCartt testified that she has concerns that [Father] continues to abuse alcohol. Further, there have been several times when the father spoke with Families Free workers at which he sounded impaired on the telephone.

123) In sum, the Court finds that this factor weighs in favor of termination and against the parents in this cause.

THE BEST INTEREST FACTORS CONTAINED IN T.C.A. § 36-1-113(i)(8) ARE APPLICABLE TO THIS MATTER.

124) It is in the child's best interests for termination to be granted as to [Mother and Father], because their mental and emotional state would be detrimental to the child and would prevent them from effectively parenting the child.

* * *

126) As to [Father], he continues to have unaddressed anger management issues, as evidenced by his numerous threats to DCS staff, service providers, and the Court. There are also many concerns about marital conflict in the family home as reflected in numerous records that have been admitted in this cause.

127) The Court finds that this factor weighs in favor of termination and against the parents.

The trial court therefore concluded that it was in the Child's best interest to terminate Mother's and Father's parental rights. Having determined that the trial court erred by admitting the Woodridge hospital records into evidence at trial, we have omitted the court's findings as to those records here and cannot consider them in reviewing the court's conclusions. Upon careful review, we agree with the trial court's conclusion that it is in the best interest of the Child for Mother's and Father's parental rights to be terminated. We will address the best interest analysis regarding each parent in turn.

A. Mother

Mother contends that termination of her parental rights is not in the best interest of the Child. When analyzing best interest, the trial court considered each factor contained within Tennessee Code Annotated §36-1-113(i) before determining that it was in the best interest of the Child that Mother's parental rights be terminated. The trial court found, and the evidence supports, that DCS made reasonable efforts to assist Mother in addressing the reasons why the Child was removed from the parents' home. Despite those efforts, Mother continued to struggle with her mental health issues as evinced by testimony of several individuals who witnessed her behavior. The trial court found that Mother's mental and emotional state would be detrimental to the Child. Mother's medical records from Frontier Health also demonstrate that Mother consistently failed to appear for scheduled mental health appointments. Additionally, Mother did not cooperate with services offered to her.

Dr. Lane, testifying as an expert in child development and parenting assessments, indicated that she was concerned because Mother did not appear to be invested in the Child. Mother's visitation was eventually ceased by the trial court in September 2015. However, even when Mother attended visits with the Child, as Ms. Rogers explained,

Mother did not engage with the Child and would sometimes sleep during the visits. The trial court found that, while there existed some degree of attachment, there was not a meaningful relationship between Mother and the Child.

Ms. Fletcher, an expert in child and family therapy, explained that a role reversal between Mother and the Child existed such that when Mother was present, the Child became the caregiver. According to Ms. Fletcher, this role reversal created an unhealthy situation for the Child. Ms. Tipton, an expert in social work, also indicated her concerns that the parents would be unable to safely parent the Child in the foreseeable future due to mental health issues, relational challenges, and lack of commitment to services offered. Significantly, the parents cancelled twenty-one of approximately thirty-two parenting education sessions offered to them. Furthermore, Mother was unable to demonstrate the parenting skills that Families Free was attempting to develop.

The evidence preponderates in favor of a determination that the Child was doing very well in her foster home placement. The Child expressed her approval of her foster home, explaining that her foster parents were "good to [her]." The Child further related that she was doing excellent work in school at the time of trial. According to Ms. Fletcher, the Child was in a "condition of suffering" when she first began attending therapy. She opined that returning the Child to her parents could cause the Child to "erode," and the Child would be benefited by remaining in foster care. From a thorough examination of the record before us, excluding Mother's Woodridge hospital records, we conclude that clear and convincing evidence exists that termination of Mother's parental rights was in the Child's best interest.

## B. Father

Father likewise contends that termination of his parental rights is not in the best interest of the Child. We have noted that the trial court considered each factor contained within Tennessee Code Annotated §36-1-113(i) before determining that it was in the best interest of the Child that Father's parental rights be terminated. The trial court found and a preponderance of the evidence supports that DCS made reasonable efforts to assist Father in addressing the reasons for the Child's removal from the parents' home. Despite those efforts, the trial court found that Father failed to make lasting changes in his lifestyle so that such change does not appear possible.

Father did not cooperate with several services offered to him. Although Father completed his initial assessments, Father did not complete the recommendations of his parenting assessment, alcohol and drug assessment, or his psychological assessment.

Father has unaddressed anger management issues and his mental and emotional state is detrimental to the Child. Father was recommended to attend individual therapy from his psychological assessment but declined treatment after the intake and initial therapy appointment. Ms. Tipton indicated her concerns that the parents would be unable to safely parent the Child in the foreseeable future due to mental health issues, relational challenges, and lack of commitment to services offered to them. Twenty-one of approximately thirty-two parenting education sessions offered to them were cancelled. According to Ms. Tipton, Father was unable to demonstrate the parenting skills that Families Free was attempting to develop.

As the trial court found, alcohol was a "big problem in this case," and Father's alcohol abuse was ongoing. Father did not comply with recommendations of his alcohol and drug assessment that he attend weekly AA meetings. Although he did attend some meetings, Father did not obtain a sponsor and was unable to identify the first step of the AA twelve-step program.

The evidence supports the trial court's finding that no meaningful relationship existed between Father and the Child. As previously noted, the Child demonstrated marked improvement while residing in her foster home and appeared to be thriving. Upon a careful and thorough review of the record, we conclude that clear and convincing evidence demonstrates that termination of Father's parental rights was in the Child's best interest.

VII. Conclusion

For the foregoing reasons, we conclude that the trial court's determination regarding the admission of Mother's hospital records into evidence was harmless error. We reverse the trial court's finding of clear and convincing evidence of the statutory ground of persistence of conditions. We affirm the trial court's judgment in all other respects, including the termination of Mother's and Father's parental rights to the Child. Costs on appeal are assessed equally to the appellants, Sherry G. and Teddy G, and the appellee, Tennessee Department of Children's Services. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE